Clerk's Office
Filed Date:  3/28/22

U.S. DISTRICT COURT
EASTERN DISTRICT OF
NEW YORK
BROOKLYN OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---------------------------------------------------------------

LIAM VARN and GRAY MATTER INC.,

                        Plaintiffs,

        v.

ORCHESTRADE, INC. and HAKIM ERHILI,

                        Defendants.

---------------------------------------------------------------

**MEMORANDUM & ORDER**
19-CV-2875 (MKB)

MARGO K. BRODIE, United States District Judge:

      Plaintiff Liam Varn commenced the above-captioned action on April 17, 2019, against

Defendants Orchestrade, Inc. ("Orchestrade") and Hakim Erhili in the Supreme Court of the

State of New York, Kings County.  (Compl., annexed to Notice of Removal as Ex. A, Docket

Entry No. 1-2.)  Defendants removed the action to this Court on May 15, 2019 based on diversity

of citizenship.  (Notice of Removal, Docket Entry No. 1.)  On January 11, 2021, Plaintiffs filed

an Amended Complaint, adding Gray Matter, Inc. ("Gray Matter") as a Plaintiff and alleging that

Defendants failed to pay them commissions and retaliated against them in violation of the New

York City Freelance Isn't Free Act, N.Y.C. Admin. Code § 20-927 *et seq*. ("FIFA"), and also

asserting a breach of contract claim.  (Am. Compl. ¶¶ 62–88, Docket Entry No. 42.)

      Pursuant to Rule 56 of the Federal Rules of Civil Procedure, Defendants moved for

summary judgment as to Plaintiffs' FIFA claims and Plaintiffs moved for summary judgment as

to their breach of contract claim.[1]  For the reasons discussed below, the Court grants Defendants'

motion for partial summary judgment and denies Plaintiffs' motion.

## I.   Background

The following facts are undisputed unless otherwise noted.

### a.   Factual background

Varn is the owner and operator of Gray Matter.  (Defs.' Stmt. of Material Facts Pursuant

to Local Rule 56.1 ("Defs.' 56.1") ¶ 1, Docket Entry No. 65-2.)  Erhili is the CEO and co-

founder of Orchestrade, a company that licenses trading risk and operational software used in

capital markets.  (*Id*. at ¶¶ 2–3.)  On March 12, 2018, Orchestrade entered into a Services

Agreement (the "Agreement") with Gray Matter, contracting Varn to work at Orchestrade.  (*Id.*

at ¶ 5; Pls.' Stmt. of Material Facts Pursuant to Local Rule 56.1 ("Pls.' 56.1") ¶ 4, Docket Entry

No. 66-1; Agreement, annexed to Pls.' Mot. As Ex. A, Docket Entry No. 66-3.)

#### i.   The Agreement

The Agreement designated Varn as "Head of US Sales for Orchestrade."  (*Scope of*

*Services*, Agreement at § 1.)  As Head of US Sales, Varn's responsibilities included "generation

of new sales opportunities in the Americas, account management of existing US client base, and

hiring and training of all US sales and presale staff."  (*Id.*)  Section 2 of the Agreement stated

that the Agreement will "continue until either party sends written notice of termination."  (*Term*

*and Termination*, Agreement at § 2.)  It also required Plaintiffs to "give one month of advance

---

[1] (Pls.' Mot. for Partial Summ. J. ("Pls.' Mot."), Docket Entry No. 66; Pls.' Mem. of
Law in Supp. of Pls.' Mot. ("Pls.' Mem."), Docket Entry No. 66-12; Defs.' Mot. for Partial
Summ. J. ("Defs.' Mot."), Docket Entry No. 65; Defs.' Mem. of Law in Supp. of Defs.' Mot.
("Defs.' Mem."), Docket Entry No. 65-1; Pls.' Opp'n to Defs.' Mot. ("Pls' Opp'n"), Docket
Entry No. 67; Defs.' Opp'n to Pls.' Mot. ("Defs.' Opp'n"), Docket Entry No. 68; Pls.' Reply in
Supp. of Pls.' Mot. ("Pls.' Reply"), Docket Entry No. 70; Defs.' Reply in Supp. of Defs.' Mot.
("Defs.' Reply"), Docket Entry No. 69.)

notice in the event that . . . Varn cannot complete the duties as outlined" and that "Orchestrade

will give Gray Matter . . .  one month of advance notice in the event that . . . Varn's services are

no longer required."  (*Id*.)

The Agreement provided for Plaintiffs to receive compensation in three forms: (1) a

retainer of $15,583 per month, (2) a commission, and (3) an annual "guarantee" payment.

(*Retainer*, Agreement at § 3.)  The commission compensation was calculated as follows:

> For each calendar year, the following commission schedule will
> apply.  For the first one million USD in total US sales, Orchestrade
> will pay Gray Matter Inc 3% of that revenue.  For total US sales
> between one million and three million USD, Orchestrade will pay
> Gray Matter Inc[.] 5% of that revenue.  For total US sales above
> three million USD, Orchestrade will pay Gray Matter 7% of that
> revenue.  Commission will be payable to Gray Matter Inc[.] upon
> Orchestrade receiving payment from the client.

(*Commission*, Agreement at § 3.2.)  In addition, the Agreement guaranteed a "sum of $50,000

(USD), provided that by the end of December [of] 2018 Liam Varn can provide a Weighted US

Pipeline of at least 2 million USD" (the "2018 Guarantee").  (*2018 Guarantee*, Agreement at §

3.3.)  The Agreement clarified further that "[f]or revenue to count toward the Weighted US

Pipeline, the total potential revenue of the deal will be multiplied by the percentage likelihood of

deal completion.  [For example,] a [one] million USD opportunity with a 20% chance to close

will count as $200,000 (USD) toward the Weighted US Pipeline."  (*Id*.)

The Agreement explicitly stated that "[t]he relationship between Orchestrade and Gray

Matter [] is such that [the] personnel of both parties are neither agents nor employees of the other

party for federal tax purposes or any other purpose whatsoever, and are not entitled to any

employee benefits of the other party."  (*General Provisions*, Agreement at § 5.)

### ii.   Plaintiffs' services

Plaintiffs bring this action in connection with services Plaintiffs provided to Defendants between March of 2018 and January of 2019 pursuant to the Agreement.  (Pls.' 56.1 ¶ 4.) Plaintiffs contend that Varn performed a variety of sales-related activities for Orchestrade including calling and meeting potential Orchestrade clients to discuss Orchestrade's software. (Defs.' 56.1 ¶ 14; Pls.' Response to Defs.' Rule 56.1 Stmt. of Material Facts ("Pls.' Counter 56.1") ¶ 14, Docket Entry No. 67-3.)  He also recorded his sales-related activities in Salesforce, Orchestrade's client relationship management system, which documented current and prospective clients for whom Varn marketed Orchestrade's software as an "Opportunity." (Defs.' 56.1 ¶¶ 15–16; Pls.' Counter 56.1 ¶¶ 15–16.)  Varn understood that the information in Salesforce would be used to calculate his Weighted US Pipeline and, thus, determine whether he would receive the $50,000 payment described in section 3 of the Agreement.  (Defs.' 56.1 ¶ 17.)

Some of the accounts that Varn worked on led to the finalization of contracts between Orchestrade and a prospective client.  (Pls.' 56.1 ¶ 6.)  On July 10, 2018, Orchestrade finalized a license agreement between Orchestrade and Client One, a financial services firm headquartered in New York that was listed in Salesforce as an Opportunity for Orchestrade.  (Defs.' 56.1 at ¶¶ 19, 21; Pls.' 56.1 ¶ 7.)  As a result of the contract, Client One paid a total of $300,000 to Orchestrade.  (Pls.' 56.1 ¶ 9.)  Varn was listed as the "Opportunity owner" over this account in Salesforce.  (*Id*. at ¶ 11; Dep. of Gordon Chan ("Chan Dep.") 74:13–75:12, annexed to Pls.' Mot. as Ex. B, Docket Entry No. 68-5.)  Defendants believed that Plaintiffs were not entitled to commission on this account because Varn was introduced to the deal after the terms of the deal were already agreed upon and two days before Varn joined Orchestrade, Defendants had sent Client One a proposal for license fees in the same amount of the signed contract.  (Pls.' 56.1 ¶

12; Defs.' Response to Pls.' Rule 56.1 Stmt. of Material Facts ("Defs.' Counter 56.1") ¶¶ 10, 12, Docket Entry No. 68-1; Chan Dep. 71:10–14.) Plaintiffs argue that Varn worked on closing the contract with Client One by negotiating Orchestrade's positions on the contract. (Pls.' 56.1 ¶ 10.)

Varn also helped close a $887,050 deal with Client Eight, a hedge fund based in New York that was listed in Salesforce as an Opportunity for Orchestrade. (Pls.' 56.1 ¶ 20; Defs.' 56.1 ¶¶ 36–38.) Varn met with Client Eight in New York. (Defs.' 56.1 ¶¶ 36–38.) Plaintiffs argue that Varn sourced and commenced negotiations with Client Eight. (Pls.' 56.1 ¶ 20.) Defendants do not dispute that Varn worked on the deal between Orchestrade and Client Eight, but contend that Client Eight was "a prospect [that Orchestrade] had in [its] system before [Varn] joined" and that the deal that Client Eight ultimately reached with Orchestrade occurred when Client Eight – not Varn – "kicked off the project again." (Defs.' Counter 56.1 ¶ 20; Chan Dep. 146:11–147:12.)

On January 11, 2019, Orchestrade entered into a contract with Client Nine, an investment management firm based in New York that was listed in Salesforce as an Opportunity for Orchestrade. (Pls.' 56.1 ¶¶ 17–18; Defs.' 56.1 ¶¶ 39–41.) Varn met with representatives of Client Nine in New York. (Defs.' 56.1 ¶¶ 39–41.) Plaintiffs argue that Varn managed and negotiated the contract. (Pls.' 56.1 ¶ 19.) Defendants do not dispute that Varn finalized the deal between Orchestrade and Client Nine, but contend that Client Nine's account was an "inbound deal" and that Varn "didn't develop any new business." (Defs.' Counter 56.1 ¶ 19; Chan Dep. 129:23–25.)

On October 10, 2018, Orchestrade entered into a contract with Client Eleven, a hedge fund headquartered in London, England and listed in Salesforce as an Opportunity for

Orchestrade.  (Pls.' 56.1 ¶¶ 13–14; Def.'s 56.1 ¶ 44)  Varn met Client Eleven in New York. (Defs.' 56.1 ¶¶ 42–44.)  Plaintiffs argue that Varn managed and negotiated the contract.  (Pls.' 56.1 ¶ 15.)  Defendants do not dispute that Varn finalized the deal between Orchestrade and Client Eleven, but contend that Client Eleven's account "was already there" when Varn "began performing services for Orchestrade.  (Defs.' Counter 56.1 ¶ 15; Dep. of Hakim Erhili ("Erhili Dep.") 53:19–20, 53:23–25, annexed to Defs.' Mot. as Ex. A, Docket Entry No. 65-4.)  Varn was listed as the "Opportunity owner" over this account in Salesforce.  (Pls.' 56.1 ¶ 16.)

On June 28, 2018, Plaintiffs emailed Defendants listing nineteen current or potential clients that were entered into Salesforce as Opportunities for Orchestrade.  (Pls.' Counter 56.1 ¶¶ 45–46.)  Of the nineteen clients listed, Varn contends that he contacted and/or met with five in New York.[2]  (Pls.' Counter 56.1 ¶ 47.)  On November 29, 2018, Varn emailed Defendants with his Weighted US Pipeline and commission schedule, listing the nineteen clients.  (*Id*. at ¶¶ 48–49.)  Of the nineteen clients listed, Varn contends that he contacted and/or met with six in New York for the Weighted US Pipeline and two for commissions.[3]  (*Id*. at ¶¶ 50–51.)

### iii.  Dissolution of the Agreement

By letter dated December 31, 2018, Orchestrade notified Plaintiffs that "Orchestrade is officially terminating the [] Agreement . . . due to our interest in hiring . . . Varn to a full-time role as a W-2 employee" and that "the termination will take effect on Jan[uary] 31, 2019." (Defs.' Counter 56.1 ¶ 22.)  Orchestrade offered to hire Varn as a full-time employee with a

---

[2]  Defendants contend that Plaintiffs met and/or contacted eight of the current or potential clients listed into Salesforce as Opportunities for Orchestrade.  (Defs.' 56.1 ¶¶ 46–47.)

[3]  Defendants contend that Plaintiffs met and/or contacted nine of the current or potential clients listed in his Weighted Pipeline, but concede that two were labelled "commissions." (Defs.' 56.1 ¶¶ 49–51.)

salary of $175,000 per year, commissions at the rates listed in the Agreement and the possibility of eventually obtaining equity in Orchestrade.  (Defs.' Stmt. of Add'l Material Facts ("Defs.' Add'l Facts") ¶ 6, Docket Entry No. 68-1 at 9–11.)  In ensuing negotiations, the parties failed to reach mutually acceptable terms for such an employment agreement.  (Pls.' 56.1 ¶ 24.)  Varn submitted a final invoice from Gray Matter for the amount he believed he was owed pursuant to the Agreement, but Orchestrade disputed the invoice.  (*Id.* at ¶ 25.)

### iv.   Varn's compensation

In December 2018, Orchestrade paid Varn $30,000 in commissions and a bonus. Orchestrade reached this total by calculating: (1) a 3% commission on a $750,000 contract with Client Eleven in 2018; (2) a 3% commission on a $200,000 contract with Client Nine; and (3) a $1,500 bonus.  (Defs.' 56.1 Add'l Facts ¶ 4.)  On February 20, 2019, Varn sent a letter to Orchestrade which attached a chart itemizing $51,000 in commissions by calculating: (1) a 3% commission on a purported $1 million contract with Client Eleven that closed in 2018; (2) a 5% commission on a $300,000 contract with Client One that closed in 2018; and (3) a 3% commission on the $200,000 Client Nine contract that closed in 2019.  (*Id*. at ¶ 10.)

### b.   Procedural background

Varn commenced the above-captioned action on April 17, 2019, against Defendants in the Supreme Court of the State of New York, Kings County.  (Compl.)  Defendants removed the action to this Court on May 15, 2019 based on diversity of citizenship.  (Notice of Removal.) Plaintiff alleged that Defendants failed to pay him wages and commissions in violation of the New York Labor Law ("NYLL") and FIFA, and also asserted claims for quantum meruit, unjust enrichment, and account stated.  (Compl.)  Defendants moved to dismiss the Complaint pursuant to Rule 12(b)(2) and 12(b)(6) of the Federal Rules of Civil Procedure and Plaintiff opposed the

motion.[4]  By Memorandum and Order dated March 29, 2020 (the "March 2020 Decision"), the

Court denied Defendants' motion to dismiss Varn's claim pursuant to FIFA, holding that he was

not barred from asserting a FIFA claim "[b]ecause [he] d[id] not allege that he solicited orders in

New York [and because] there is nothing in the record to suggest that Plaintiff was a sales

representative within the meaning of [NYLL §] 191-a." *Varn v. Orchestrade*, No. 19-CV-2875,

slip op. at 24 (E.D.N.Y. Mar. 30, 2020).  The Court granted Defendants' motion to dismiss

Varn's NYLL, quantum meruit, unjust enrichment, and account stated claims, and in a separate

order dated December 11, 2020, allowed Varn to amend the Complaint.  (*Id.* at 17–19, 26–32;

Order dated Dec. 11, 2020.)

On January 11, 2021, Varn filed an Amended Complaint, adding Gray Matter as a

Plaintiff, reasserting his FIFA claim, and adding claims for breach of contract and violation of

FIFA's retaliation provision.  (Am. Compl. ¶¶ 62–88.)  Defendants moved for partial summary

judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure as to Plaintiffs' FIFA

claims and Plaintiffs cross-moved for summary judgment as to their breach of contract claim

related to section 3.2 of the Agreement.  Defendants argue that they are entitled to summary

judgment on Plaintiffs' FIFA claims because Varn's solicitations of potential Orchestrade clients

at their offices in New York City make Varn a "sales representative" under NYLL § 191-a,

barring Plaintiffs' FIFA claims.[5]  (Def.'s Mem. at 1–2.)  Plaintiffs argue that they are not barred

from bringing claims pursuant to FIFA because the Agreement makes no mention of NYLL §

---

[4]  (Defs.' Mot. to Dismiss ("Defs.' Mot."), Docket Entry No. 19; Defs.' Mem. in Supp. of
Defs.' Mot. ("Defs.' Mem."), Docket Entry No. 20; Decl. of Chris L. Sprengle in Supp. of Defs.'
Mot. ("Sprengle Decl."), Docket Entry No. 21; Pls.' Mem. in Opp'n to Defs.' Mot. ("Pls.'
Opp'n"), Docket Entry No. 22.)

[5]  Defendants do not seek summary judgment on Plaintiffs' breach of contract claims.

191-a and suggests that Varn intended to serve in a role "markedly different" from that of a "sales representative."  (Pls.' Opp'n at 5.)

Plaintiffs also move for summary judgment as to their breach of contract claim pertaining to section 3.2 of the Agreement, for $21,000 in unpaid commissions.[6]  (Pls.' Mem. at 5.) Plaintiffs argue that the evidence on the record demonstrates that Defendants failed to pay them for the deal with Client One.[7]  (Pls.' Mem. at 1.)  Defendants respond that Plaintiffs are not entitled to summary judgment on their claims for unpaid commissions because there are triable issues of fact.  (Defs.' Opp'n at 1.)

## II.  Discussion

### a.  Standard of review

Summary judgment is proper only when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *Borley v. United States*, 22 F.4th 75, 78 (2d Cir. 2021); *Windward Bora, LLC v. Wilmington Sav. Fund Soc'y*, 982 F.3d 139, 142 (2d Cir. 2020).  The court must "constru[e] the evidence in the light most favorable to the non-moving party" and "resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought."  *Lenzi v. Systemax, Inc.*, 944 F.3d 97, 107 (2d Cir. 2019) (first quoting *VKK Corp. v. Nat'l Football League*, 244 F.3d 114, 118 (2d Cir. 2001); and then quoting *Johnson v. Goord*, 445 F.3d 532, 534 (2d Cir. 2006)).  The role of the court "is not to resolve disputed questions of fact but only to determine whether, as to any material issue, a genuine factual dispute exists."  *Rogoz v. City of*

---

[6]  Plaintiffs' do not seek summary judgment on their FIFA claims and concede that their remaining claim for breach of section 3.3 of the Agreement should be resolved at trial.  (Pls.' Mem. at 2.)

[7]  Plaintiffs also seek compensation for purportedly underpaid commissions under the underpayment section of FIFA, N.Y.C. Admin. Code § 20-927 *et seq*.  (Pls.' Mem. at 2.)

*Hartford*, 796 F.3d 236, 245 (2d Cir. 2015) (first quoting *Kaytor v. Elec. Boat Corp.*, 609 F.3d

537, 545 (2d Cir. 2010); and then citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50

(1986)).  A genuine issue of fact exists when there is sufficient "evidence on which the jury

could reasonably find for the [nonmoving party]."  *Anderson*, 477 U.S. at 252.  The "mere

existence of a scintilla of evidence" is not sufficient to defeat summary judgment.  *Id.*  The

court's function is to decide "whether, after resolving all ambiguities and drawing all inferences

in favor of the non-moving party, a rational juror could find in favor of that party."  *Pinto v.*

*Allstate Ins. Co.*, 221 F.3d 394, 398 (2d Cir. 2000).

> **b.  Defendants' summary judgment motion regarding Plaintiff's FIFA claims**

Defendants argue that they are entitled to summary judgment as to Plaintiff's FIFA

claims because Varn is an independent contractor and sales representative that solicited orders in

New York state and thus is precluded from asserting claims under FIFA.  (Defs.' Mem. at 8.)  In

support, Defendants argue that Varn has admitted in his sworn deposition testimony that he met

with or contacted current and potential Orchestrade clients in New York and that his admissions

are corroborated by information entered into Salesforce.  (*Id.*)

Plaintiffs argue they are not excluded from asserting FIFA claims because (1) the

Agreement makes no reference to NYLL § 191-a; (2) the Court previously found that Plaintiffs

are not precluded from asserting claims under FIFA; (3) the legislature did not mean to exclude

independent contractors like Plaintiffs from FIFA's scope; and (4) there are triable issues of fact

to determine FIFA's applicability.  (Pls.' Opp'n at 8–9.)

FIFA § 20-929 provides in relevant part:

> a.  Except as otherwise provided by law, the contracted
> compensation shall be paid to the freelance worker either:
> 1. On or before the date such compensation is due under the terms
> of the contract;

* * *

        b. Once a freelance worker has commenced performance of the services under the contract, the hiring party shall not require as a condition of timely payment that the freelance worker accept less compensation than the amount of the contracted compensation.

N.Y.C. Admin. Code § 20-929; *see Monzano-Moreno v. Libqual Fence Co.*, No. 18-CV-161, 2021 WL 730663, at *18 (E.D.N.Y. Feb. 5, 2021) ("FIFA regulates the relationship between 'freelance work[s]' and those who retain their services, the 'hiring party,' in New York City." (quoting N.Y.C. Admin. Code § 20-927)), *report and recommendation adopted sub nom. Monzano-Moreno v. Fence*, 2021 WL 688295 (E.D.N.Y. Feb. 23, 2021); *StClair v. Sansal*, 155 N.Y.S.3d 712, 713 (N.Y. Civ. Ct. 2021) ("Passed in 2016 and made effective in 2017, FIFA created new protections for New York City's freelance workforce against unlawful practices by employers."); *Varn*, slip op. at 20–21.  Few New York courts have considered the applicability of this provision of the statute.  In *Sandles v. Magna Legal Services, LLC*, the New York City Civil Court found that "FIFA, effective May 15, 2017, 'establishes an administrative complaint procedure and private right of action,' and codifies certain protections for freelance work exceeding $800, including the requirement of an itemized, written contract upon request, timely payment in full, and protection from a hiring party's retaliation against the exercise of those, or any other, rights guaranteed by FIFA."  90 N.Y.S.3d 843, 846 (N.Y. Civ. Ct. 2018) (citation omitted) (first quoting Michael Fahner, *Promising Protection: An Assessment of New York City's Freelance Isn't Free Act*, 14 NYU J.L. & Bus. 1049, 1056 (2018); then citing N.Y.C. Admin. Code §§ 20-928[a], 20-929, 20-930); *see also StClair*, 155 N.Y.S.3d at 713; *Turner v. Sheppard Grain Enters., LLC*, 127 N.Y.S.3d 260, 262 (N.Y. Sup. Ct. 2020) ("FIFA was passed largely to protect freelance workers who were denied compensation by *inter alia* imposing double damages on companies that breached agreements." (citing Caitlin M. Baranowski, *Freelance Isn't Free:*

11

*The High Cost of New York City's Freelance Isn't Free Act on Hiring Parties*, 12 Brooklyn J. Corp. Fin. & Com. L. 439, 443 (2018)); *Varn*, slip op. at 21–22. FIFA "protects the rights to a written contract upon request and prompt payment." *Sandles*, 90 N.Y.S.3d at 850 (citing N.Y.C. Admin Code §§ 20-928, 929).

"FIFA defines a freelance worker as 'any natural person or any organization composed of no more than one natural person, whether or not incorporated or employing a trade name, that is hired or retained as an independent contractor by a hiring party to provide services in exchange for compensation.'" *Turner*, 127 N.Y.S.3d at 262 (quoting N.Y.C. Admin Code § 20-927). However, section 20-927 explicitly excludes from the definition of "freelance worker" "[a]ny person who, pursuant to the contract at issue, is a sales representative as defined in section 191-a of the labor law." N.Y.C. Admin Code § 20-927. (*Id.*) Section 191-a defines a sales representative as "an independent contractor," as opposed to an employee, who "solicits orders in New York state and is not covered by [NYLL sections 190(6)[8] and 191(1)(c)[9]]." *N. Shore Window & Door, Inc. v. Andersen Corp.*, No. 19-CV-6194, 2021 WL 4205196, at *13 n.13 (E.D.N.Y. Aug. 3, 2021) (quoting *Derven v. PH Consulting, Inc.*, 427 F. Supp. 2d 360, 369 (S.D.N.Y. 2006)); *DeLuca v. AccessIT Grp., Inc.*, 695 F. Supp. 2d 54, 62 (S.D.N.Y. 2010) (citing N.Y. Labor Law § 191–a(d)); *Gould Paper Corp. v. Madisen Corp.*, 614 F. Supp. 2d 485, 491

---

[8] Section 190(6) defines a "Commission salesman" as an:

> employee whose principal activity is the selling of any goods, wares, merchandise, services, real estate, securities, insurance or any article or thing and whose earnings are based in whole or in part on commissions. The term "commission salesman" does not include an employee whose principal activity is of a supervisory, managerial, executive or administrative nature.

N.Y. Labor Law § 190(6).

[9] Section 191(1)(c) describes the frequency of payment for commission salespersons. N.Y. Labor Law § 191(1)(c).

(S.D.N.Y. 2009) ("Per the statute, a sales representative is an independent contractor who 'solicits orders in New York state.'" (quoting N.Y. Labor Law § 191–a(d)); *Derven*, 427 F. Supp. 2d at 369 ("According to § 191–a(d), a 'sales representative' is 'a person or entity who solicits orders in New York state and is not covered by [§ 190(6) and § 191(1)(c), which protect employees who earn commissions as part of their salary] because he or she is an independent contractor.'" (alteration in original) (quoting N.Y. Labor Law § 191-a(d))).  "In other words, salaried employees who receive commissions are protected under § 191(1)(c), while independent contractors are covered by §§ 191–a through 191–c." *Derven*, 427 F. Supp. 2d at 369.

Varn is a sales representative who is excluded from asserting claims pursuant to FIFA.  It is undisputed that Varn is an independent contractor.  *See Varn*, slip op. at 23.  (*See* Defs.' Mem. at 8; Pls.' Opp'n at 7.)  It is also undisputed that Varn's contractual duties consisted of generating new sale opportunities and managing existing client relationships.  (*Scope of Services*, Agreement at § 1.)  Varn performed a variety of sales-related activities for Orchestrade including calling or meeting with Orchestrade clients in New York to discuss Orchestrade's software and gain business.  *See McCoy Assocs., Inc. v. Nulux, Inc*., 218 F. Supp. 2d 286, 293 (E.D.N.Y. 2002) (defining solicitation as "effort[s] to gain business" in New York).  (Defs.' 56.1 ¶¶ 14, 19– 21, 36–44; Pls.' 56.1 ¶¶ 4, 13–14, 17, 20.)  The Agreement also outlined a compensation structure for his sales.  (*Retainer*, Agreement at § 3.)  At a minimum, Varn met with Clients Eight, Nine, and Eleven in New York to market Orchestrade's software, (Defs.' 56.1 ¶¶ 36–44), and recorded his sales-related activities in Salesforce, (Defs.' 56.1 ¶¶ 15–16; Pls.' Counter 56.1 ¶¶ 15–16).  Further, Plaintiffs have not provided evidence demonstrating a genuine dispute that Varn's activities were not solicitations.  (*See generally* Pls.' Opp'n.; Pls.' 56.1.)  A reasonable juror would not dispute that given Varn's responsibilities, he was contracted as a sales

13

representative and performed his duties, at least in part, in New York and is therefore excluded from pursing claims pursuant to FIFA.  *See* N.Y.C. Admin Code § 20-927 (providing that the term "freelance worker" does not include "[a]ny person who, pursuant to the contract at issue, is a sales representative as defined in section 191-a of the [NYLL]"); *Derven*, 427 F. Supp. 2d at 369 (recognizing that a sales representative is a person or entity who solicits orders in New York state); *see also N. Shore Window & Door, Inc.*, 2021 WL 4205196, at *13, n.13 (same); *AHA Sales, Inc. v. Creative Bath Prods., Inc.*, 867 N.Y.S.2d 169, 177 (N.Y. App. Div. 2008) ("[P]laintiff fits the statutory definition of 'sales representative' because it is an entity which solicits orders in New York State and is an independent contractor.").

Plaintiffs contend that the record evidence demonstrating that Varn is a salesperson is irrelevant because FIFA requires the contract to explicitly state that the person is a sales representative as defined under NYLL § 191-a for FIFA's exclusionary clause to apply and the Agreement does not mention NYLL § 191-a.  (Pls.' Opp'n at 9–10.)  However, the plain language of FIFA does not require the definition of a sales representative to be *explicit* in the contract, only *pursuant to* the contract.  Nevertheless, the parties' intent, as derived from the plain meaning of the language in the Agreement, indicates that Varn was expected to market Orchestrade's software to potential and current clients and to solicit their business.  *See N.Y. Wheel Owner LLC v. Mammoet Holding B.V.*, 481 F. Supp. 3d 216, 243 (S.D.N.Y. 2020) ("It is well established that a written contract must be interpreted according to the parties' intent, which is 'derived from the plain meaning of the language employed in the agreements.'" (quoting *In re Lehman Bros. Inc.*, 478 B.R. 570, 585–86 (S.D.N.Y. 2012))).

Plaintiffs also argue that the legislature could not have intended to exclude independent contractors that solicit orders in New York from FIFA because they have no other remedy to

challenge uncompensated commissions.  (Pls.' Opp'n 13.)  Plaintiffs do, however, have other remedies and have asserted one such remedy in this action — breach of contract.[10]  (*See* Am. Compl. ¶¶ 83–88.)  In addition, the plain language of the law excludes particular categories of independent contractors, including sales representatives, licensed practicing attorneys, and licensed medical professionals.  *See* N.Y.C. Admin Code § 20-927; *see also Chen v. Bd. of Immigr. Appeals*, 164 F. Supp. 3d 612, 618 (S.D.N.Y. 2016) (recognizing that "[t]o ascertain [legislative] intent, we begin with the statutory text because if its language is unambiguous, no further inquiry is necessary").

Plaintiffs also argue that the Court has already determined that Plaintiffs are not precluded from asserting claims under FIFA, (Pls.' Opp'n at 10–11), but misunderstand the Court's March 2020 Decision denying Defendants' motion to dismiss the Complaint based on the pleadings.  *See Varn*, slip op. at 23–24.  In the March 2020 Decision, the Court denied Defendants' motion "[b]ecause Plaintiff d[id] not allege that he solicited orders in New York [and because] there is nothing in the record to suggest that Plaintiff was a sales representative within the meaning of [NYLL §] 191-a." *Id*. at 24.  At the summary judgment stage, rather than Plaintiffs' allegations, the Court considers the undisputed facts regarding Plaintiffs' job

---

[10]  The Court also recognizes that independent contractors who solicit orders in New York may also challenge untimely payments under NYLL § 191-c.  *See N. Shore Window & Door, Inc. v. Andersen Corp.*, No. 19-CV-6194, 2021 WL 4205196, at *13 n.13 (E.D.N.Y. Aug. 3, 2021) (recognizing that the NYLL §§ 191-a through 191-c protect employees who solicit orders in New York state and are independent contractors (citing NYLL § 191-a); *DeLuca v. AccessIT Grp., Inc.*, 695 F. Supp. 2d 54, 61 (S.D.N.Y. 2010) ("[NYLL] § 191-c governs the payment of sales commissions '[w]hen a contract between a principal and a sales representative is terminated.'" (alteration in original) (quoting N.Y. Labor Law § 191-c(1))); *Gould Paper Corp. v. Madisen Corp.*, 614 F. Supp. 2d 485, 491 (S.D.N.Y. 2009) ("Under [NYLL § 191-b], sales representatives are to be paid their earned commissions in accordance with a written contract, but not later than five days after the commission has been earned.  If a principal violates § 191-b, § 191-c provides for double damages, in addition to fees and costs.").

responsibilities and activities.[11]  *Town & Country Linen Corp. v. Ingenious Designs LLC*, --- F.

Supp. 3d ---, ---, 2021 WL 3727801, at *42 (S.D.N.Y. Aug. 23, 2021) ("The law of the case

doctrine . . . does not preclude this [c]ourt from reconsidering issues on summary judgment that

have initially been raised in the context of a motion to dismiss." (first alteration in original)

(quoting *Nobel Ins. Co. v. City of New York*, No. 00-CV-1328, 2006 WL 2848121, at *4

(S.D.N.Y. Sept. 29, 2006))); *RSL Commc'ns PLC v. Bildirici*, 649 F. Supp. 2d 184, 204

(S.D.N.Y. 2009), *aff'd sub nom. RSL Commc'ns PLC, ex rel. Jervis v. Fisher*, 412 F. App'x 337

(2d Cir. 2011) (same).

Accordingly, the Court grants Defendants' motion as to Plaintiffs' FIFA claims.

### c.   Plaintiffs' motion for summary judgment in their breach of contract claim relating to section 3.2 of the Agreement

Plaintiffs argue that they are entitled to summary judgment as to their breach of contract

claim pertaining to section 3.2 of the Agreement because Defendants paid Varn $30,000 and he

was entitled to $51,000.  (Pls.' Mem. at 5.)  In support, Plaintiffs argue that the phrase "total US

sales" unambiguously indicates that Plaintiffs are entitled to commissions on all sales to any

---

[11]  Plaintiffs rely on the Court's prior decision in *United States v. Catholic Health Sys. of Long Is. Inc*, No. 12-CV-4425, 2018 WL 3825906 (E.D.N.Y. 2018), which rejected arguments that had already been raised in a prior motion to dismiss under the law of the case doctrine, but their reliance is misplaced.  (*See* Pls.' Opp'n at 11.)  In *Catholic Health Systems*, defendants moved to dismiss the fourth amended complaint and for partial summary judgment "restat[ing] the same arguments previously advanced in their motion to dismiss" without citing to "an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice."  *Id.* at *4–5 (quoting *Jackson v. New York State*, 523 F. App'x. 67, 69 (2d Cir. 2013)).  The Court declined reconsideration of defendants' legal arguments because "when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages of the same case.'"  *Id*. at *5 (quoting *Arizona Premium Fin. Co. v. Emps. Ins. of Wausau, of Wausau Am Mut. Co*., 586 F. App'x. 713, 716 (2d Cir. 2014)).  The Court's March 2020 Decision was based on an assessment of the factual allegations in the Complaint as to whether Plaintiff had stated a claim, while the Court bases its current decision on the undisputed facts.

US-based client of Orchestrade, including Client One.  (*Id*. at 10.)  Plaintiffs argue that Varn

closed three sales while at Orchestrade: (1) a contract entered on July 10, 2018 with Client One

under which Orchestrade was paid $300,000; (2) a contract entered on October 10, 2018 with

Client Eleven under which Orchestrade was paid $1,000,000; and (3) a contract entered on

January 11, 2019 with Client Nine under which Orchestrade was paid $200,000.  (Pls.' Mem. at

7.)  Plaintiffs assert that his sales were (1) $1.3 million in total US sales in 2018, which requires

a commission of $45,000,[12] and (2) $200,000 in US sales in 2019, which requires a commission

of $6,000,[13] for a total of $51,000.  (*Id*.)

Defendants argue that Plaintiffs were paid all of the commissions to which they were

owed under the Agreement.  (Defs.' Opp'n at 1.)  In support, Defendants assert that the

Agreement, read in whole, indicates that Plaintiffs were not entitled to commissions on all sales

to all US-based clients, it only entitled Plaintiffs to commissions for sales to new clients that

Varn generated.  (*Id*. at 2–3.)  Defendants contend that Plaintiffs are entitled to a $30,000

payment compromised of (1) a 3% commission on a $750,000 contract with Client Eleven that

closed in 2018;[14] (2) a 3% commission on a $200,000 contract with Client Nine which closed in

2019;[15] and (3) a $1,500 bonus.  (*Id*. at 6.)  Defendants also argue that Plaintiffs are not entitled

to a commission for the deal with Client One because it was a preexisting client.  (*Id*. at 2.)

"Under New York law, which governs the [a]greement, the threshold question on a

motion for summary judgment 'with respect to a contract claim is whether the contract is

---

[12]  3% of $1,000,000 is $30,000 and 5% of $300,000 is $15,000.

[13]  3% of $200,000 is $6,000.

[14]  3% of $750,000 is $22,500.

[15]  3% of $200,000 is $6,000.

17

unambiguous with respect to the question disputed by the parties.'" *Ambac Assurance Corp. v. U.S. Bank Nat'l Ass'n*, No. 21-CV-70, 2021 WL 6060710, at *2 (2d Cir. Dec. 20, 2021) (quoting *Law Debenture Tr. Co. of N.Y. v. Maverick Tube Corp.*, 595 F.3d 458, 468 (2d Cir. 2010)).   A contract provision is unambiguous "where the contract language has a definite and precise meaning, unattended by danger of misconception in the purport of the contract itself, and concerning which there is no reasonable basis for a difference of opinion." *Id.* (quoting *Law Debenture Tr. Co.*, 595 F.3d at 467); *Lockheed Martin Corp. v. Retail Holdings, N.V.*, 639 F.3d 63, 69 (2d Cir. 2011) (recognizing that a contract provision is unambiguous "if the language it uses has a definite and precise meaning, as to which there is no reasonable basis for a difference of opinion" (citing *White v. Cont'l Cas. Co.*, 848 N.Y.S.2d 603, 605 (2007))).   By contrast, "[a] contract is ambiguous when its terms could suggest 'more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business.'" *Utica Mut. Ins. Co. v. Munich Reinsurance Am., Inc.*, 594 F. App'x 700, 703 (2d Cir. 2014) (quoting *Lightfoot v. Union Carbide Corp.*, 110 F.3d 898, 906 (2d Cir. 1997)); *see also Lockheed Martin*, 639 F.3d at 69 ("[T]he language of a contract is ambiguous if it is capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement." (citing *Krumme v. WestPoint Stevens Inc.*, 238 F.3d 133, 138–39 (2d Cir. 2000))).   In determining whether a contract provision is unambiguous, a court must consider the contract as a whole.   *See Ambac Assurance Corp*, 2021 WL 6060710, at *2 ("When the meaning of a particular provision is disputed, 'the task of the court is to determine whether such clauses are ambiguous when read in the context of the entire agreement.'" (quoting *Law Debenture Tr.*

*Co.*, 595 F.3d at 467)); *Lockheed Martin*, 639 F.3d at 69. "If the contract 'as a whole makes clear the parties' over-all intention, courts examining isolated provisions should choose the construction which will carry out [the parties' intent]." *Ambac Assurance Corp*, 2021 WL 6060710, at *2 (quoting *Lockheed Martin*, 639 F.3d at 69); *see Matter of Westmoreland Coal Co. v. Entech, Inc.*, 100 N.Y.2d 352, 358 (2003) (stating contracts should be read "as a harmonious and integrated whole" and each part should be "interpreted with reference to the whole . . . to give effect to its general purpose"); *Kass v. Kass*, 91 N.Y.2d 554, 566–67 (1998)).

The Agreement is ambiguous as to whether section 3.2 entitles Plaintiffs to all US-based sales or only US-based sales which he generated. Section 3.2 states that Plaintiffs' commission compensation is calculated by a percentage of the revenue of the "total US sales." (*Commission*, Agreement at § 3.2.) The plain language of the phrase supports an inference that Plaintiffs would receive compensation for all sales worked on because he was head of sales and managed both new and existing clients. *See Com. Lubricants, LLC v. Safety-Kleen Sys., Inc.*, No. 14-CV-7483, 2017 WL 3432073, at *7 (E.D.N.Y. Aug. 8, 2017) ("[W]ords and phrases should be given their plain meaning and a contract should be construed so as to give full meaning and effect to all of its provisions." (quoting *Orchard Hill Master Fund Ltd. v. SBA Commc'ns Corp.*, 830 F.3d 152, 157 (2d Cir. 2016))). (Pls.' Reply at 2, 3; *Scope of Services*, Agreement at § 1.) However, the second paragraph of section 3.2 limits Plaintiffs' commission compensation, explaining that in the event that other sales representatives are hired, those individuals will report to Varn and Plaintiffs will (1) receive a "discounted" commission on "[a]ny sales opportunities in [Salesforce] prior to the date of hire of [the] US sales representative, [but] transferred to that representative" and (2) not receive a commission on sales opportunities generated after the new representative's hire and managed entirely by that representative. (*Id.*) In addition, section 1 of

the Agreement expressly limits Varn's sales responsibilities to, among other things, "generation of *new* sales opportunities." (*Scope of Services*, Agreement at § 1 (emphasis added).) Viewed as a whole, and especially in light of section 1, section 3 may be construed to suggest that Plaintiffs are not entitled to commissions generated by new sales representatives and also not entitled to receive commissions on *any* sales that Varn did not generate. *See InspiRx, Inc. v. Lupin Atlantis Holdings SA,* No. 20-CV-3214, 2021 WL 3604850, at *8 (S.D.N.Y. Aug. 12, 2021) (recognizing that it is "well-established law that a court must 'read the integrated contract "as a whole to ensure that undue emphasis is not placed upon particular words and phrases," and "to safeguard against adopting an interpretation that would render any individual provision superfluous"'" (quoting *Law Debenture Tr. Co*., 595 F.3d at 468)). (*See Commission*, Agreement at § 3.2 ("Any sales opportunities generated after the date of hire of a new US sales representative, that are managed entirely by that representative, will not be realized as Commission payable to Gray Matter Inc.").) Moreover, Erhili testified that paying a salesperson only for new clients that the representative brings to a company is standard practice in the financial software industry. *See Glob. Reinsurance Corp. of Am. v. Century Indem. Co*., 22 F.4th 83, 94–95 (2d Cir. 2021) (recognizing that "[w]hile extrinsic evidence of the parties' subjective intentions 'is generally inadmissible to add to or vary the [contract],' evidence of industry custom and usage 'is considered, as needed, to show what the parties' specialized language is fairly presumed to have meant'" (quoting *Law Debenture Tr. Co*., 595 F.3d at 466–67)). (Defs.' Opp'n at 14–15; Defs.' Add'l Facts ¶ 3; Erhili Dep. 55:1–20.) Viewing this evidence in the light most favorable to Defendants, the Court cannot determine that the Agreement unambiguously entitles Plaintiffs to compensation for all completed sales that were generated prior to Varn's arrival or that he was not responsible for its closing. *See Nippon Yusen Kaisha v. FIL Lines USA Inc*., 977 F. Supp. 2d

343, 349 (S.D.N.Y. 2013) ("Contract language is ambiguous if it is 'capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business.'" (quoting *Am. Home Assurance Co. v. Hapag Lloyd Container Linie, GmbH*, 446 F.3d 313, 316 (2d Cir. 2006))).

Given the Agreement's ambiguity as to which sales opportunities are included in Plaintiffs' commission compensation, the Court cannot determine if, pursuant to the Agreement, Client One should be included in Plaintiffs' commission compensation value.[16]  *See Dish Network Corp. v. Ace Am. Ins. Co.*, 21 F.4th 207, 212 (2d Cir. 2021) ("Where 'resolution of a dispute turns on the meaning of an ambiguous term or phrase,' summary judgment should usually be denied." (quoting *Fed. Ins. Co. v. Am. Home Assurance Co*., 639 F.3d 557, 567 (2d Cir. 2011))); *D'Amato v. Five Star Reporting, Inc*., 80 F. Supp. 3d 395, 423 (E.D.N.Y. 2015) (denying summary judgment on a breach of contract counterclaim where the record consisted of conflicting evidence and witness declarations, "whose weight and credibility it is not for the court to determine at the summary judgment stage"); *LaSalle Bank Nat'l Ass'n v. Merrill Lynch Mortg. Lending, Inc*., No. 04-CV-5452, 2007 WL 2324052, at *15 (S.D.N.Y. Aug. 13, 2007) ("[T]he question of the materiality of a party's contractual [breach] is a question better suited for resolution by a jury than this Court.").

---

[16]  There is also a genuine dispute as to whether Plaintiffs' work on Client One's deal was meaningful enough to constitute a sale.  (*See* Pls.' Reply at 5–6 (arguing that Varn worked on "the sales process" and "the final contract" for Client One's account and also "went on calls with the clients" and "negotiated [Orchestrade's] positions" before the contract was signed and closed); Defs.' Opp'n at 12–13 (arguing that Varn's role was limited to getting the contract signed).)

Accordingly, the Court denies Plaintiffs' motion as to its breach of contract claim relating to section 3.2 of the Agreement.[17]

## III.   Conclusion

For the foregoing reasons, the Court grants Defendants' motion for summary judgment and dismisses Plaintiffs' FIFA claims for underpayment and retaliation and denies Plaintiffs' motion for summary judgment on its breach of contract claim relating to section 3.2 of the Agreement.

Dated: March 26, 2022
       Brooklyn, New York

SO ORDERED:

                                                           ___ s/ MKB _____
                                                         MARGO K. BRODIE
                                                         United States District Judge

---

[17] Plaintiffs also seek compensation for underpaid commissions under the underpayment section of FIFA. (Pls.' Mem. at 5.) Because the Court dismisses Plaintiffs' FIFA claims, the Court also finds that Plaintiffs are not entitled to damages under FIFA. Plaintiffs concede that the parties' contractual dispute concerning section 3.3 of the Agreement, the 2018 Guarantee, is not amendable to summary disposition. (Pls.' Mem. at 6.)